IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CAROL. L. LAWRENCE,
etc.,

                Plaintiff,                Case No. 3:09 CV 1067

    -vs-

                                          MEMORANDUM OPINION

RAYMOND CORPORATION,

                Defendant.

KATZ, J.

This matter is before the Court on the Motions in limine to exclude the testimony of Thomas Berry (Doc. No. 76) and Frank Burg (Doc. No. 74) and the Motion for Summary Judgment (Doc. No. 75) filed by Defendant The Raymond Corporation ("Raymond" or "Defendant"), Plaintiffs' Responses (Doc. Nos. 89-91), and Raymond's Replies (Doc. Nos. 92 and 93). The Court notes diversity jurisdiction under 28 U.S.C. §1332 and proper venue under 28 U.S.C. §1391. For the reasons stated below, the Motion to exclude Burg will be denied as moot, the Motion to exclude Berry will be granted, and the Motion for Summary Judgment will be granted.

**I. BACKGROUND**

On April 6, 2007, Plaintiff Carol Lawrence[1] was injured while driving a forklift. At the time, she had recently (34 days) begun working for Lowe's Home Centers, Inc. ("Lowe's") at its

---

[1] The other Plaintiffs are two of her children who were dependant on Lawrence at the time of the accident and joined the suit under a loss of consortium claim. The plural "Plaintiffs" refers to all three and "Lawrence" refers to Carol Lawrence alone.

Findlay, Ohio distribution center. When she was injured, Lawrence was driving a stand-up forklift[2] manufactured by Raymond (specifically an EASi Pacer R40-C40TT or "Pacer").

The Raymond Pacer at issue is a stand-up, rear entry forklift. It is designed so that an operator stands sideways, with his or her right foot toward the forks. The operator's left foot remains by the entrance of the forklift. In order to drive in the direction the forks point, an operator turns his or her head to the right; to drive the other way (or forks trailing), the operator turns his or her head to the left. An operator's right foot depresses a "deadman pedal" (an inverse brake pedal such that the forklift will brake if the pedal is not depressed) and both of his or her hands are occupied by the controls.

The Raymond Pacer, like many other stand-up forklifts designed by Raymond and other stand-up forklift designers, leaves the rear entrance open. In other words, the standard configuration of the Raymond Pacer has no door to keep anything in or out. Raymond offers a separate, spring-loaded (the door is held shut and closes of its own power due to springs) door ("rear guard") for customers who wish to keep objects out of the operator compartment (such as lengths of wood or pipe). The rear guard is not designed to keep anything in a forklift. The Pacer Lawrence was driving at the time of her accident did not include the rear guard.

Raymond also offers a light sensor training device. This device applies some, but not all, of the forklift's braking force if a light beam is broken and is meant to train operators to keep all extremities within the operator compartment while a forklift is moving. In addition, there is a

---

[2] The type of vehicle in question is often referred to as a "lift truck" in addition to "forklift." For simplicity, the Court will use only "forklift."

warning label inside the operator compartment, facing the operator at approximately eye-level, which reminds operators to keep all parts of their bodies within the forklift while operating it.

Raymond, like other stand-up forklift manufacturers, intentionally leaves the entrance of the Pacer (and other stand-up forklift models) unobstructed. Such manufacturers, as well as safety bodies such as the American National Standards Institute ("ANSI") and the Occupational Safety and Health Administration ("OSHA"), have determined that an unobstructed exit path could help operators in certain types of accidents.[3] In such accidents, manufacturers, ANSI, OSHA recommend an operator exit a falling forklift, if possible, by simply stepping out the back. This is in contrast to sit-down forklifts where attempts to exit a falling forklift are discouraged. Both the Raymond rear guard and lift sensor training device are designed to interfere with escape as little as possible; the interference it does cause is one of the cited reasons that the rear guard is not standard equipment on Raymond stand-up forklifts.

Despite this common knowledge, there are a few specific stand-up forklift customers who insist that their forklifts all have doors, often hinged doors that cannot be merely pushed open. These customers have very specific environments and uses in mind for their stand-up forklifts, and thus order non-standard equipment (including optional equipment, the doors, not always otherwise available as add-ons). Lowe's is not one of these customers, nor is its Findlay, Ohio distribution center one of those environments.

When Lawrence was injured, she was training to drive the Raymond Pacer at issue. As a trainee, she was supervised by a trainer and allowed to operate without a time constraint. Further,

---

[3] Most notably off the dock incidents, where a forklift falls off a loading dock, and lateral tip-overs, where a turning forklift falls to one side or the other.

she stated that due to her discomfort as a forklift operator, she always operated at a "creeping" speed, stating that she never went as fast as half-speed. One of the difficulties she was then training to overcome was the effect of her height (4'6") on her ability to see during certain operations. She did state that her height did not interfere with her ability to drive the Pacer in a forks trailing direction.

At approximately 11:30 a.m. on the day of the accident, Lawrence was moving a pallet of product from a truck to her appointed spot. She set the pallet down several feet in front of a support column. In order to back the forks of the Pacer she was driving out of the pallet she had just set down, Lawrence drove the Pacer in a forks trailing direction toward the support column. Somehow, her left foot was out of the operator compartment and was crushed when the Pacer she was operating struck the support column. At her deposition, Lawrence stated that she could not remember anything between when she removed the pallet of product from the truck and after her foot had been crushed.[4] Further, she stated that she has no actual memory of how her foot came to be outside of the operator compartment and between the back of the Pacer (i.e. off to the side) and the support column. She did state that "evidently I got jarred," but claimed no memory of any jarring in response to the next several questions. Lawrence Dep. 65-66.

Plaintiffs filed suit against Raymond, Lowe's, and Andersen & Associates of Ohio ("Andersen"). Defendants removed the case from the Court of Common Pleas for Hancock County, Ohio due to diversity of citizenship. Lowe's filed a subrogation cross-claim against

---

[4] The parties also refer to a transcript of a phone conversation where Lawrence's memory gap did not start until she nearly hit the support column, but Lawrence has not corroborated her statements in that transcript: she did not recall the conversation at her deposition and has submitted no affidavit corroborating her portion of it.

Raymond. Doc. No. 49. Plaintiffs settled with Lowe's (Doc. No. 54) and dismissed their claims against Andersen (Doc. No. 83).

Against Raymond, Plaintiffs assert Ohio law claims for defective design, defective warning, and punitive damages. Initially, Plaintiffs named three experts: Lewis Barbe, Frank Burg, and Thomas Berry. Plaintiffs withdrew Barbe on the day of Burg's deposition. Doc. No. 74-1 at 1. Defendant moved to exclude both Burg and Berry, stating that their expert opinions failed to satisfy the requirements of FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579. (1993). Defendant also moved for summary judgment against Plaintiffs.

## II. STANDARDS

*A. Motions in Limine Standard*

Motions in limine are generally used to ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child and Family Serv.*, 115 F.3d 436, 440 (7th Cir.1997). The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds. *Cf. Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984) (federal district courts have authority to make in limine rulings pursuant to their authority to manage trials). Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. (citations omitted). Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain

5

objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine. *See United States v. Connelly*, 874 F.2d 412, 416 (7th Cir.1989) (citing *Luce*, 469 U.S. at 41) ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400- 1401 (N.D.Ill.1993)

*B. Daubert Standard for Expert Testimony*

The legal standard to be used in *Daubert* challenges was set forth by Judge Bechtle in his memorandum opinion issued on February 1, 2001:

> Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than subjective belief or speculation. *Id.* at 589-590. Further, Rule 702 requires that expert testimony assist the trier of fact, i.e., it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.
> In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id*. at 592-93. Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).
> In *Daubert*, the Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94. These factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller*, 167 F.3d at 152.

> In addition, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000). In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 382b (5th Cir. 1996).
>
> Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1987); *STX, Inc. v. Brine, Inc.*, 37 F. Supp. 2d 740, 768 (D.Md. 1999) (quotation omitted), *aff'd*, No. 99-1540, 2000 WL 564010 (Fed. Cir. May 8, 2000); *Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998).
>
> Lastly, the court "should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 595. Federal Rule of Evidence 703 "provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts and data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Id*. (quoting Fed. R. Evid. 703). Under Rule 703, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Paoli RR. Yard PCB Litig.*, 35 F.3d [717,] 748 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985).

*In re: "Diet Drugs (Phenermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *5-6 (E.D. Pa. Feb. 1, 2001) (footnotes omitted). The district court is not required to hold a hearing to address a *Daubert* issue. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999).

*C. Summary Judgment*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The moving party bears the initial responsibility

7

of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)). The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006); *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'"

8

*Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071; *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004) . The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*D. Ohio Product Liability Law*

Under Ohio law strict liability for defectively designed products attaches when a plaintiff shows: "(1) there was a defect in the product manufactured and sold by the defendant, (2) the defect existed at the time the product left the defendant's control, and (3) the defect was the direct and proximate cause of the plaintiff's injuries or losses." *Donegal Mut Ins. v. White Consol. Indus., Inc.*, 852 N.E.2d 215, 220 (Ohio Ct. App. 2006) (citing *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 523 N.E.2d 489, 493 (Ohio 1988)). A defective design may be shown by proof that (1) "the benefits of the challenged design do not outweigh the risks inherent in such design" (the risk-benefit test) or (2) "the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" (the consumer expectations test) *Cremeans v. Int'l Harvester Co.*, 452 N.E.2d 1281, 1284 (Ohio 1983) (consumer expectations test repealed by statute).

9

Further, Ohio law also recognizes a claim for defective warning where a manufacturer, at the time a product left its control, knew of a risk and "failed to provide the warning or instruction that a manufacturer exercising reasonable care" would have for that product and that risk. O.R.C. §2307.76(A). In addition, a plaintiff must show that the inadequate warning proximately caused his or her injury. *Seley v. G.D. Searle & Co.*, 423 N.E.2d 831, 838 (Ohio 1981). Finally, no claim lies where the risk is "open and obvious" or "a matter of common knowledge." O.R.C. §2307.76(B).

### III. ANALYSIS

*A. The Testimony of Thomas Berry and Frank Burg*

Plaintiffs hired Thomas Berry to testify that the Raymond Pacer was defectively designed because it did not have a latching rear door. From 1981 until 2005, Berry worked for John Sevart at a company called Advance Technology, Inc. ("ATI"). After Sevart retired, Berry continued his work, sharing space with Sevart's son and finishing some of Sevart's cases. Berry works as an engineering consultant (as he did for ATI). Given Ohio law on design defect, the theory critical to Berry's testimony in this case is that the risks of an unobstructed entrance outweigh the costs relative to a latching rear door. Defendant primarily questions Berry's testing of his ideas and the general acceptance of his methods and theories.

In addition to the four factors mentioned in *Daubert* (testing, peer review, error rate, and general acceptance), the Sixth Circuit what essentially a fifth factor: whether the expert's opinion was "prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). This factor applies in a slightly different manner from the

10

standard factors: "if a proposed expert is a 'quintessential expert for hire,' then it seems well within a trial judge's discretion to apply the *Daubert* factors with greater rigor." *Id.* at 435. Berry is clearly a "quintessential expert for hire" because "more than 95 percent [of his work] has to do with matters that are in litigation or potentially in litigation." Berry Dep. 235-36. However, his opinion on rear doors for stand-up forklifts is not so clear. Berry claimed to have originally formulated his opinion while working on a project for ATI and there is no clear statement of the amount of work ATI did in connection with litigation and it is unclear whether the project Berry worked on when he formulated his opinion concerning latching rear doors was connected with litigation. Even so, Berry has not sold his ideas to forklift manufacturers, does little non-litigation research, and "the prepared-solely-for-litigation factor is not, of course, a totally binary exercise." *Johnson*, 484 F.3d at 435. n2. Thus, the Court will examine Berry's opinions rigorously.

Berry's alternative design ideas strongly lend themselves to testing: one need merely compare injury rates and severities. As such, his testing is perhaps the most important factor. *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (cited with approval in *Brown v. The Raymond Corp.*, 432 F.3d 640, 648 (6th Cir. 2005)).

Berry's testing falls into two categories, report sorting and specific tests. His report sorting involves hundreds of accident reports kept by Crown, another stand-up forklift maker. The Court uses the term "report sorting" because Berry specifically denied doing any sort of statistical analysis. Instead, he categorized this mass of reports and came to some conclusions. The Court has two serious problems with this process. First, the Court does not even have the results of the exercise, only Berry's analysis of those results. Not only that, but Berry has not confirmed any of the reports nor checked for accidents not appearing in those reports. Second, Berry stated that he

11

has done no analysis, beyond observation, to understand the actual trends he claims to have observed.  Berry could have simply seen that a large number of accidents related to a specific behavior and determined that the behavior was a problem, when, in fact, that behavior may simply be many times more common.  In other words, without computing even a rate, let alone a standard deviation or relevance test, Berry's analysis adds little to what anyone (i.e. a juror) can do.

While his sorting exercise may have value and depend upon his experience, it does not establish correlation, without which his analysis fails.  Further, without seeing even an example of the results, the Court cannot actually determine if he applied his experience in a way that would help a jury.  An expert is not a black box into which data is fed at one end and from which an answer emerges at the other; the Court must be able to see the mechanisms in order to determine if they are reliable and helpful.

Berry's specific tests are slightly clearer, but no more helpful to a jury in demonstrating the risks associated with the two options.  First, Berry used some pipe to analyze the forces involved when a person's foot is trapped between a forklift and an object.  Second, he placed hand restraints on a forklift, got inside with a helmet on, and tipped the forklift.  These tests both contribute to Berry's conclusion, but, without more, are not nearly enough to establish that the Pacer is riskier without a latching door than with one.  Without even addressing design flaws, Berry has only addressed the potential damage from one of the two types of accidents and one aspect of the alternative design.  For example, they demonstrate nothing about the extent of other injuries or the rate of successful escape.

Finally, Berry refers to a test of exit time differences with a latching door versus without a latching door.  This result actually undermines his conclusion, because the test showed an

increased exit time with the door he recommends, a result he dismisses based on an analysis he claims to have performed but about which he gave no details other than saying it relied on "the laws of physics and technical papers" rather than actual testing. Doc. No. 73-15 at 8. Berry refers to other tests and papers that he read in connection with his latching rear door thesis, but gives few details.

Berry's lack of detail and reliance on obviously incomplete data and testing has left the Court with insufficient ability to gauge the reliability of his methods or his application of those methods to reach his conclusion. Thus, the testing factor weighs heavily against the admissibility of any of his testimony.

Berry does not fair any better on general acceptance. Though Plaintiffs emphasize Berry's two votes on the ANSI forklift panel in order to establish his credentials (which the Court does not even reach), those votes show that few in the forklift design field accept his theory. Berry twice occupied Sevart's place on the panel while Sevart was presenting proposed standards for stand-up forklifts which would have required latching rear doors. Both times Berry was the only vote for the proposal. Further, Defendant notes that the panel has remained unconvinced, an argument Plaintiffs misconstrue as relating to satisfying a standard which Defendant admits does not apply because it came out after the Pacer was manufactured and sold.

There has been some implication that the panel has been captured by the industry, but this idea runs into two problems. First, there were other, non-manufacturer members on the panel, including independent consultants like Sevart and Berry as well as government members, and absolutely none of these agreed with Sevart and Berry. Second, no one described the motivation for excluding doors in light of the costly litigation which has plagued the industry; why would

13

manufacturers exclude a piece Plaintiffs emphasize is relatively cheap and subject themselves to so much litigation costs?

Finally, no manufacturer offers standard rear doors, let alone a latching door. Further, Berry makes an uncorroborated reference to one of the customers who insists upon rear doors and admits that customer would **not** "require this protection for all employers of stand-up lift trucks," as Berry would. Doc. No. 73-15 at 5.

Not only is Berry's testing seriously insufficient to support his conclusion, but his theory and method application has been consistently rejected by the community of stand-up forklift designers. These two factors weigh so strongly against his testimony that no other factors (and there is only a small reference to peer review) could save Berry's expert opinion in this case. As such, the Court finds that his expert opinion, which amounts to little more than his *ipse dixit* that his theory is correct, supported by evidence, and accepted, is unreliable and unlikely to help a fact finder. Therefore, Defendant's Motion to exclude Berry's testimony is granted.

Defendant filed a Motion to exclude the testimony of Frank Burg. (Doc. No. 74). Plaintiffs responded to Defendant's Motion stating that they would not be using him at trial. Thus, Defendant's Motion is denied as moot.

*B. Design Defect*

In response to Defendant's Motion for summary judgment, Plaintiffs point to Berry's conclusion that the risks of the Pacer design outweigh its benefits and claim that the case will likely turn on the practicality of his proposed alternative (a latching door) under O.R.C. §2307.75(F). Under Ohio law, the Pacer design is not defective if there was no "practical and technically feasible alternative design" available when the product left Defendant's control and

14

which would have prevented Lawrence's injury. *Id.* Plaintiffs claim that any disagreement over whether the door suggested satisfies the statute prevents summary judgment because when "conflicting evidence is introduced as to any one of the elements necessary to constitute a violation of the statute, a jury question is created." *Tomlinson v. Cincinnati*, 446 N.E.2d 454, 456 (Ohio 1983).

However, without Berry, Plaintiffs cannot contest the balance of risks and benefits of the Pacer design. Just because a jury question may arise as to one element a claim will not survive summary judgment if it clearly fails another element. Thus, the Court will not even address Plaintiffs' claim that the dispute over whether their proposed alternative is feasible raises a jury question or whether they can raise the alternative design without Berry. Without testimony on how to weigh the risks and benefits of the chosen design, and they have not noted any testimony on that point other than Berry's, Plaintiffs cannot get to the point where an alternative design is a relevant question.

In response to Defendant's attack on Berry's testimony, Plaintiffs also invoke the consumer expectations test. While it is true that the consumer expectations[5] test generally does not require expert testimony and turns on consumers' expectations of performance, there are limits to the jury question it involves. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 455-56 (6th Cir. 2000) (quotations omitted). Here, Plaintiffs have failed to present any evidence of the expectations of normal consumers (users) or any type of forklift. Presumably, Plaintiffs intend to

---

[5] Defendant raises the question of whether the consumer expectations test was even part of the law when the forklift at issue was designed and manufactured. However, the state of the law is less clear than Defendant claims due to events following the original repeal. *Bleh v. Biro Mfg. Co.*, 756 N.E.2d 121, 124 (Ohio Ct. App. 2001) (citations omitted). As such, it is simpler to consider the merits of the consumer expectations test than its applicability.

15

invoke either Lawrence's specific expectations or to appeal to the expectations of the jury as general consumers. However, "under Ohio law, the standard for gauging 'consumer expectation' is not based on what the [plaintiff] would have expected but on whether *ordinary consumers* are aware of the ... alleged dangers." *Jordan v. Paccar, Inc.*, 37, F.3d 1181, 1184 (6th Cir. 1994) (emphasis in original). Further, unlike a product such as a car, a forklift is not a product used by the general populace. Because Plaintiffs have no expert and pointed to no one else who could speak to the expectations of forklift users, their inability to rely on the expectations of either Lawrence or the public (i.e. the jury) leaves them without any evidence on a critical element of the consumer expectations test.

Because Plaintiffs have presented insufficient evidence to satisfy either the risk-benefit test or the consumer expectations test, the Court will grant Defendant summary judgment on Plaintiffs' design defect claims.

*C. Defective Warning*

Plaintiffs assert that the warnings provided to Lawrence regarding the dangers of the open-back design of the Pacer were defective. Plaintiffs and Defendant dispute the actual adequacy of the warning provided and whether Berry's opinion would have satisfactorily established any inadequacy. The Court need not address the question of adequacy because of the obviousness of the danger and Plaintiffs' failure to establish proximate cause.

The only danger Plaintiffs identify in discussing the warnings provided is "crush injuries to the left foot and ankle." Doc. No. 91 at 11. Beyond the clear danger of a limb being crushed between a large vehicle and a stationary object, no less an authority than Lawrence herself affirms

16

the obviousness of that danger. Lawrence Dep. 64, 166. Thus, Plaintiffs cannot make out a claim for defective warning of a crush hazard.

In addition, Plaintiffs' counsel and Berry imply that there should be a warning concerning the method by which Lawrence's foot came to be outside the operator's compartment.[6] This claim must fail due to a lack of proximate cause. Proximate cause in a defective warning case requires both that a plaintiff would have acted differently with a different warning and that the different action would have prevented the accident. *Seley*, 423 N.E.2d at 838.

Plaintiffs correctly note that they may rest on a presumption of proximate cause if they establish inadequacy. *Hisrich*, 226 F.3d at 451 (quoting *Seley*, 423 N.E.2d at 838). However, this presumption may be rebutted by Lawrence's lack of recollection of having read the warning. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417 at *12 (N.D. Ohio) *appeal docketed*, No. 10-3912 (6th Cir. July 20, 2010) (citing *Phan v. Presrite Corp.*, 653 N.E.2d 708, 711 (Ohio Ct. App. 1994)). Plaintiffs respond by pointing to *Boyd v. Lincoln Electric Co.*, 902 N.E.2d 1023 (Ohio Ct. App. 2008), where an insufficient display negated a plaintiff's failure to read. However, *Boyd* is factually distinguishable: it involved a warning on packaging the user/plaintiff never saw. 902 N.E.2d at 1033. The court explicitly distinguished the case before it from the situation where a warning is in plain view but unread. *Id*. ("it is not that Boyd chose not to *read* the warnings, but that he did not ever *see* the warnings due to the manufacturers' placement") (emphasis in original). The warning on the Pacer is displayed within the operator compartment, facing the operator at approximately eye-level. The Pacer warning was in plain

---

[6] Interestingly, Plaintiffs' counsel and Berry disagree over the how Lawrence's foot left the operator's compartment.

17

view, thus Lawrence's failure to read prevents the presumption of proximate cause and Plaintiffs' warning defect claim fails.

*D. Punitive Damages*

Under Ohio law, if a defendant's defective design "manifested a flagrant disregard of the safety of persons who might be harmed by the product in question," a plaintiff may recover punitive or exemplary damages. O.R.C. §2307.80(A). Because Plaintiffs cannot establish that Lawrence's accident and injury stemmed from a design defect, their punitive damages claim fails.

Plaintiffs also raised claims for manufacturing defect, failure to conform to representation, and that the Ohio Product Liability Act is unconstitutional. These claims have been abandoned. The only part of the case remaining is the subrogation crossclaim Lowe's filed against Raymond (Doc. No. 49).

## IV. CONCLUSION

For the reasons discussed herein, Defendant's Motion to Exclude the Testimony of Frank Burg (Doc. No. 74) is denied as moot and Defendant's Motions to Exclude the Testimony of Thomas Berry (Doc. No. 76) and for Summary Judgment (Doc. No. 75) are granted.

Lowe's and Raymond are granted until August 11, 2011 to file a joint status report concerning the subrogation crossclaim filed by Lowe's (Doc. No. 49).

IT IS SO ORDERED.

             s/ *David A. Katz*
             DAVID A. KATZ
             U. S. DISTRICT JUDGE